[Crim. No. 25856. Second Dist., Div. Five. July 31, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
CLAYTON PIERRE ANDERSON, Defendant and Appellant.

326

## COUNSEL

Clifford Douglas, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth and Keith I. Motley, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

HASTINGS, J.—Defendant was charged by information with robbery. (Pen. Code, § 211.) It was alleged that he used a firearm in the commission of the offense. Defendant pleaded not guilty and waived jury trial. A motion for acquittal (Pen. Code, § 1118) was denied, as was a motion to suppress evidence (Pen. Code, § 1538.5). The court found defendant guilty of robbery, but did not fix the degree of the offense.[1] No

---

[1] It therefore became second degree robbery by operation of law. (Pen. Code, § 1157.)

finding was made with respect to an alleged prior felony conviction. The court found that defendant was armed at the time of the offense. Following diagnostic studies pursuant to section 1203.03 of the Penal Code, probation was denied and defendant was committed to the California Youth Authority. He appeals from the judgment (order of commitment).

In the early morning hours of September 29, 1973, Edward Damon was approaching his car on Harcourt near Adams Boulevard, having just left a bar around the corner. Damon was accompanied by a friend, James Packnett. As Damon reached his car he heard a voice say, "Don't move or you're dead." He started to turn around. He saw someone pointing a rifle at him. Then he was hit in the back of the head and fell to the ground. The person who hit him was someone other than the person he had seen holding the rifle. Damon may have lost consciousness for a short time. When he came to, defendant was leaning over him, going through his pockets. Defendant was holding a rifle. Damon was semi-conscious at the time but he saw defendant's face very clearly. Damon was sufficiently conscious to distinguish things and could identify defendant. He did not have any doubt at the trial as to defendant's identity. Defendant took from Damon's pocket his wallet, $171 in cash, his Master Charge and Bankamericard credit cards, his driver's license and a hospital card. After defendant finished going through Damon's pockets, he shot the front and rear tires on Damon's car. Then he fled with several companions. The people from the bar Damon had been at came to his assistance. They helped him back to the bar, put ice on his head and called the police. The police arrived within five or ten minutes. They took Damon to a house several blocks away. Damon thought Packnett was in the police car with him. There were a number of people milling around in the yard. The police brought three or four people over to the car for the purpose of having Damon identify his assailant, if he could, but Damon said that he did not care to identify anyone at that moment because his head ached badly and he did not wish to accuse anyone unless he was certain. Damon did not recall whether or not defendant was one of the people brought to the police car. The police then drove Damon to the police station to make a report. There, while walking to the bathroom, Damon passed a room where suspects were waiting to be booked. Damon saw defendant in that room and recognized him. He told this to a police officer. He did nothing else about identifying defendant at that time because he was still feeling sick. At some later time Damon picked defendant's photograph out of a book containing 70 or 80 different pictures. When Damon appeared to testify

at defendant's preliminary hearing, a police officer told him that his credit cards had been taken off defendant's person and that he could retrieve them at the police station.[2] Damon did not bother getting them, however, as he had already applied for a new driver's license and credit cards.

James Packnett testified that as he and Damon reached Damon's car they were approached by three men, one of whom opened his coat and pulled out a shotgun. Packnett turned and ran back to the bar where he informed the owner that a robbery was taking place. The bar owner called the police. Packnett identified defendant as the man with the shotgun. He had been face to face with defendant at the time defendant displayed the weapon.

Packnett had had about five beers that evening and was feeling their effect slightly. He did not think that he was drunk, however. Packnett did not recall being driven to a house in the neighborhood by police. He did recall identifying defendant at the police station shortly after the robbery. He believed that the officers brought in three groups of men and that defendant was in the last group. Packnett thought that Damon was with him at the time he identified defendant and that Damon concurred in the identification. Damon testified that Packnett was an epileptic. Packnett testified that he was at the point of having a seizure while at the police station. His seizures were sometimes brought on by stress or excitement.

Officer Major of the Los Angeles Police Department testified that he responded to the scene of the robbery at about 1 a.m., September 29, 1973, and had a discussion with Damon and Packnett. Major then left and went to a house on Palm Grove, a nearby street, as a result of having received certain information. Major saw about 10 people in the house on Palm Grove. He requested and was granted permission to search the premises for a robbery suspect. While searching the garage at the location, Major found defendant lying beneath an overturned couch. Defendant was perspiring. Damon and Packnett meanwhile had been transported to the location in another vehicle. Major brought defendant and two other men over to the car so that Damon and Packnett could see them. All three men were in handcuffs. Damon and Packnett both identified defendant there in the field. There was no further showing of suspects to Damon or Packnett at the station. After leaving the Palm Grove location Major found some .30 caliber carbine shells near the corner of Harcourt and Wilcox. Wilcox was the first street immediately

---

[2] This testimony was elicited on cross-examination. No hearsay objection was raised.

south of Adams. Major also found Damon's driver's license and social security card near the shells: He did not find them on defendant's person. He found some empty .30 caliber carbine casings at the scene of the robbery.

The People rested at the conclusion of Major's testimony. Defendant moved for acquittal alleging that the inconsistencies in the prosecution's case rendered the identification testimony unworthy of belief. The motion was denied.

Defendant testified in his own behalf that he had gone to a party in Baldwin Hills with two friends sometime after 9 p.m. on the night of his arrest. On the way home from the party, sometime around midnight, they stopped to visit a mutual friend at the house on Palm Grove where the arrest took place. They played cards until just before the police came. They were on their way out of the residence when the police arrived. Defendant ran and hid in the garage because he had some cases pending and he did not want to get into any more trouble. He was perspiring when the officer found him because it was warm under the couch. Defendant denied having committed the charged robbery. He testified that Packnett identified him at the scene, but that Damon said nothing. Both Packnett and Damon were brought to the door of the room defendant was seated in at the police station, but neither said anything. Defendant denied ever owning a .30 caliber rifle. He denied any knowledge that a loaded .30 caliber carbine was in his bedroom on July 30, 1973. He lived at home with his parents.

Clarence Goodall and Leonard Layto Ray testified that they were the two friends with defendant on the night in question. They corroborated his testimony about the party in Baldwin Hills and about the purpose of their visit to the house on Palm Grove. They both denied participation in the robbery. Goodall testified that one of the two prosecution witnesses[3] had identified defendant at the scene, that defendant was the only one at the scene in handcuffs, and that the man who identified defendant was intoxicated.

The prosecution sought to put on rebuttal evidence to which defendant objected on the ground that it had been obtained through an unlawful search and seizure. The cause was transferred to a different court where a hearing was had on a motion to suppress. (Pen. Code, § 1538.5.) The motion was denied. Trial resumed. The People called defendant's mother, Gertrude Anderson. She testified that a police

---

[3]Goodall identified the witness by means of physical description, but not by name.

officer had searched defendant's bedroom on July 30, 1973, and that he brought a rifle out of the bedroom. Mrs. Anderson had previously seen the rifle in a closet in her home. The last time she saw it after July 30, it was behind a clothes dryer on the utility porch. The rifle belonged to defendant's former boss.

Officer Graves testified that he searched defendant's bedroom on July 30, 1973, and found a carbine under the bed. There was only one bed in the room. The officer checked the serial numbers on the weapon. It had not been reported stolen and he left it at the residence.

The evidence adduced at the hearing on the motion to suppress was as follows: Officer Graves testified that on July 30, 1973, he was investigating the robbery of an Arco gas station. A citizen named Steele who owned a liquor store located just south of the gas station told Graves that he had observed the suspects running from the gas station. He identified defendant by name as one of the suspects and told the officer where defendant lived. Graves and three other officers proceeded to defendant's house, arriving there about 8:30 a.m.[4] Defendant's mother opened the door. Graves asked her if defendant was home. She said that he was not. Graves told her that defendant was a robbery suspect and asked for permission to search the house. It was Graves' intention to search for defendant, although he could not recall if he expressly indicated that purpose in his request to search. Mrs. Anderson gave her permission for the officers to search. Graves searched the residence for defendant. He did not find defendant, but did find a carbine under defendant's bed.

Defendant's mother testified that her son's room was not locked off from the rest of the house and that it was open to her for whatever reason she might want to enter it. Defendant did not pay rent to his parents for the room.

In denying the motion to suppress, the court stated that it was not unreasonable to think that a mother might hide her son and in view of how recently the offense had occurred, it was appropriate for the officers to search for defendant. The court further found that a search for a person under a bed is not unreasonable and that the officer was not obliged to close his eyes to the gun he saw there. The court stated that the situation would have been different had the officers found the weapon in a search through drawers.

---

[4]The robbery had occurred at 8 a.m.

■ Defendant's first contention on appeal is that the court erred in denying his motion to suppress. "A search is not unreasonable when made with the consent of a third party whom the police reasonably and in good faith believe to have authority to so consent." (*People* v. *Carr*, 8 Cal.3d 287, 298 [104 Cal.Rptr. 705, 502 P.2d 513].) It was entirely reasonable for the officer to conclude that Mrs. Anderson had authority to consent to a search of the residence for the purpose of verifying that her son was not there. There is no evidence that any more extensive search than that was undertaken. The motion under section 1538.5 was properly denied.[5]

■ Defendant also reiterates on appeal the contention he raised below in connection with his motion for acquittal, namely that the inconsistencies in the testimony of the various prosecution witnesses as to the manner in which defendant was identified rendered the identification testimony unworthy of belief. He further argues that when the weakness of the prosecution testimony is viewed in conjunction with the alibi evidence presented by the defense, it renders the evidence as a whole insufficient to sustain the conviction.

It is, of course, axiomatic that issues of credibility are to be resolved by the trier of fact. (*People* v. *Lyons*, 47 Cal.2d 311, 320 [303 P.2d 329].) There was nothing inherently improbable in the testimony of any one of the prosecution's witnesses taken alone. Obviously the three versions differed with respect to the details of how the victims identified defendant; but resolution of these discrepancies was within the sole discretion of the trial court. There was no discrepancy in the essential fact that both Damon and Packnett identified defendant and no one else. There was ample evidence to sustain the judgment.

Finally, defendant contends that the armed allegation should be stricken since he might ultimately be sentenced to prison pursuant to sections 1780 to 1783 of the Welfare and Institutions Code. He cites *People* v. *Cox*, 33 Cal.App.3d 378 [109 Cal.Rptr. 43], and *People* v. *Doran*, 36 Cal.App.3d 592 [111 Cal.Rptr. 793], for the proposition that sections 12022 and 12022.5 of the Penal Code are inapplicable to a second degree robbery conviction. The People concede the applicability of *Doran* and *Cox* vis-a-vis section 12022 of the Penal Code, but not with respect to section 12022.5. Defendant asserts that we must hold section

---

[5]Even if the search had been improper, the taint had long since been attenuated when the evidence was introduced in the trial herein. (*People* v. *McInnis*, 6 Cal.3d 821 [100 Cal.Rptr. 618, 494 P.2d 690]; *Lockridge* v. *Superior Court*, 3 Cal.3d 166 [89 Cal.Rptr. 731, 474 P.2d 683].)

12022.5 inapplicable to a conviction for second degree robbery on the same rationale that the court applied to section 12022 in *People* v. *Cox, supra.* The same justification does not exist with respect to section 12022.5, however, and the analogy is therefore inapposite. Section 12022 has been held inapplicable to a first degree conviction of any offense as to which being armed was the factor that led to the classification of the offense as first degree. (*People* v. *Bauer,* 1 Cal.3d 368 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398]; *People* v. *Floyd,* 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862].) In *Cox* the court held section 12022 inapplicable to a conviction for second degree robbery on the sound theory that to do otherwise would result in second degree robbery being punished more severely than first degree.

 Section 12022.5 of the Penal Code was enacted to avoid the result reached in *Bauer, supra,* and *Floyd, supra.* (*People* v. *Henry,* 14 Cal.App.3d 89 [91 Cal.Rptr. 841].) It was expressly made applicable to certain enumerated offenses, including robbery, whether or not being armed was an element of the offense. Since section 12022.5 is applicable to a first degree robbery conviction, holding it applicable to a second degree robbery conviction does not render the latter more severely punishable than the former. Although in the modification of judgment ordered in *People* v. *Cox, supra,* the court stated that the judgment was to recite that both sections 12022 and 12022.5 were inapplicable, we interpret the case as including section 12022.5 in the modification because it was factually inapplicable in that case, not because it was legally so.

 The information herein alleged that defendant had "used" a firearm in the commission of the offense, thus speaking in the language of section 12022.5 of the Penal Code. The court's finding, however, was that "defendant was armed," the language of section 12022. Defendant asserts that we must hold section 12022.5 inapplicable in the absence of a specific finding of use by the trial court. In *People* v. *Washington,* 17 Cal.App.3d 470 [94 Cal.Rptr. 882], it was held that where the trial was by the court and no finding was made as to use of the weapon, the cause should be remanded for a special finding on that subject. In *People* v. *Najera,* 8 Cal.3d 504 [105 Cal.Rptr. 345, 503 P.2d 1353], the court dealt with an inadequate finding as to a section 12022.5 allegation in the context of a jury trial. The court ruled that it was highly impractical to remand the case for a new jury trial on the firearm use allegation and that the People had waived application of section 12022.5 by failing to have the matter resolved at trial. (*People* v. *Najera, supra,* 8 Cal.3d 504, 512.)

The People concede that the armed finding made by the trial court herein was inadequate to invoke the provisions of section 12022.5. They argue, however, that under the authority of *People* v. *Washington, supra,* the cause should be remanded to enable the trial judge to make a proper finding. Defendant, on the other hand, argues that the same standards of proof should apply to both court trials and jury trials, and since *Najera* precludes remanding the matter in a jury trial, a similar rule should be established in court trials. Otherwise, defendant argues, an invidious distinction will be drawn between defendants who waive jury trial and those who do not, a distinction which affords the People a second opportunity to prove a firearm use allegation against the former, but not against the latter. The unfairness of this distinction is compounded, defendant asserts, by the fact that defendants are not apprised of it when their jury waiver is taken. We find defendant's arguments persuasive. While it is true, as the People claim, that *Najera* distinguished *Washington* in regard to this issue and did not overrule it, the court in *Najera* addressed itself only to the question of practicality. It was on this basis that it found *Washington* distinguishable. The court in *Najera* was not called upon to decide and did not consider the question of fundamental fairness which defendant raises herein. We, of course, are called upon to decide this issue and we conclude that in the aftermath of *Najera* the rule set forth in *Washington* is no longer tenable. We hold that whenever the People fail to have the applicability of section 12022.5 determined at trial, be the trial by court or by jury, they will be deemed to have waived it.

The judgment (order of commitment) is modified by striking therefrom the language "allegation of being armed at the time of the commission of the offense having been found true." As so modified, the judgment is affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 9, 1975.