[No. B003430. Second Dist., Div. Five. May 15, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
MARY ANN LEIGH, Defendant and Appellant.

**COUNSEL**

Daniel Ritkes, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Marc E. Turchin and Thomas L. Willhite, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FEINERMAN, P. J.**—After a court trial, defendant, Mary Ann Leigh, was convicted of first degree murder (Pen. Code, § 187) and attempted robbery (Pen. Code, §§ 664/211). She was sentenced to state prison for 25 years to life for the murder (count I) and to the midterm of 2 years for the attempted robbery (count II). The sentence on count II was stayed pending completion of the sentence on count I, the stay then to become permanent. Defendant was given credit for 245 days spent in custody, plus 82 days good time/work time.

Defendant contends that the evidence was insufficient to support a finding of aiding and abetting an attempted robbery and that a sentence of 25 years to life was cruel and unusual punishment. We affirm the underlying convictions and remand for sentencing reconsideration.

## BACKGROUND

On August 26, 1982, defendant and a friend, Janice Briggs (Briggs) were leaving a nightclub when the victim, Harry Lakey (Lakey), approached them in his car and honked his horn. The women accepted a ride from Lakey and they stopped at a liquor store to buy some beer, rum, and cola before proceeding to defendant's home.

While at defendant's home, Lakey indicated that he wanted to have sex with the women, but they insisted that he buy them some PCP first. The three then drove to the victim's bank where he withdrew five $20 bills from an automatic teller and subsequently put the money in his socks.

Defendant then directed the victim back to the Imperial Courts Housing Projects in the vicinity of 114th Street in search of Darrin Gilliam, a.k.a. "Stymie" (Stymie), from whom defendant and Briggs had purchased PCP in the past. Defendant asked Stymie if he had any sherman (i.e. PCP) and went to speak with him for a few minutes. Defendant and Stymie entered the victim's car and told him to drive around the corner. Defendant and Stymie left the car and were overheard talking about robbing the victim and dividing up his money.[1]

Shortly thereafter, Stymie's friend, Ronnie, arrived with some PCP and a gun. Stymie gave defendant the PCP and she returned to the victim's car. Stymie and Ronnie soon followed, opened the victim's door and ordered him out of his car at gunpoint. When the victim put his car in reverse, Ronnie and Stymie began shooting. As the car slowed down, Ronnie pulled the victim from his auto and took his wallet. Ronnie and Stymie drove off in the victim's car and stripped it for parts. They also discovered that the victim's wallet had no money. The victim died of gunshot wounds to the chest and arm.

## DISCUSSION

### I

Defendant contends that People's case was based on divergent and inconsistent testimony and therefore failed to establish a shared criminal

---

[1]There is some conflict in the testimony here. Stymie testified that defendant told him that the victim had a lot of money and planted the idea of committing the attempted robbery. Defendant, however, maintained that Stymie asked her if the victim had any money and initiated the robbery scheme. Briggs' testimony suggests that she was unsure if defendant was the first to mention taking the victim's money, but she did hear defendant and Stymie discuss its division.

intent beyond a reasonable doubt. She argues that the evidence was legally insufficient to find defendant guilty of aiding and abetting. We disagree.

When the sufficiency of evidence is challenged, we must review the whole record in a light most favorable to the judgment and determine whether it discloses substantial evidence—such that a reasonable trier of fact could find guilt beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) We must presume in support of the judgment the existence of every fact which the trier of fact could reasonably deduce from the evidence. (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) ■ Moreover, the testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions. (*People* v. *Maxwell* (1979) 94 Cal.App.3d 562, 574-577 [156 Cal.Rptr. 630].)

■ Defendant highlights the conflict in evidence as to who initiated the robbery attempt. The record indicates that the trial judge disbelieved defendant's exculpating version of the facts[2] and believed both Stymie's story that defendant promoted the attempted holdup and Briggs' testimony that Stymie and defendant talked about taking the victim's money and dividing it up. It was the trial judge's function to evaluate the testimony and to determine the credibility of the witnesses. We do not find the testimony of Stymie and Briggs so inherently suspect that it would not inspire the confidence of a reasonable trier of fact. (See, e.g., *People* v. *Lang* (1974) 11 Cal.3d 134, 139-140 [113 Cal.Rptr. 9, 520 P.2d 393].) In the case at bench, sufficient evidence exists to support the trial court's judgment that defendant acted with knowledge of Stymie's wrongful purpose and specifically intended to encourage or facilitate the attempted robbery. ■ ■ ■ 3.) (*People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].)[3]

---

[2]At trial, defendant admitted telling the police, in a signed statement after the killing, that she knew that Stymie would rob the victim before the victim drove to the location where he was shot. However, she recanted this statement in court, saying that the police had scared her into making it.

[3]Defendant depends in part for her argument on the holding in *People* v. *Beeman, supra,* 35 Cal.3d 547, which requires that to be convicted of a crime on a theory of aiding and abetting, a defendant must not only have knowledge of the perpetrator's wrongful purpose but must have an intent or purpose either of committing, or of encouraging or facilitating commission of the offense. When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime, the aider and abettor must also share the specific intent of the perpetrator. We note that although *Beeman* was decided after the offenses committed here, that it has been given retroactive application. (See, e.g., *People* v. *Tovar* (1984) 161 Cal.App.3d 137, 142-143 [207 Cal.Rptr. 255].)

## II

■ Defendant further contends that a sentence of 25 years to life for felony murder was disproportionate to her culpability and therefore constituted cruel and unusual punishment. Specifically, she argues that in light of the holding in *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], that the punishment must be tailored to defendant's personal responsibility and moral guilt.

In *Dillon,* the court held that the felony-murder rule is a creature of statute and could not be judicially abrogated. However, the court also held that the penalty for first degree felony murder, like all statutory penalties, is subject to the constitutional prohibition against cruel and unusual punishment and to the rule that a punishment is impermissible if it is grossly disproportionate to the offense as defined or committed, and/or to the individual culpability of the offender. (*People* v. *Dillon, supra,* 34 Cal.3d at pp. 477-478.)

In determining proportionality in felony murder cases, the court in *Dillon* delineated a three-factor test:[4] First, a court must review the " 'nature of the offense,' " both in the abstract and in relation to the facts of the crime in question. Thus, in *Dillon,* the court found that although in the abstract that robbery-murder presented a very high level of danger, second only to deliberate and premeditated murder with malice aforethought, that it was necessary to explore the totality of circumstances surrounding the commission of the offense—including such factors as its motive, the way it was committed, the extent of the defendant's involvement and the consequences of his acts. (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.)

Second, the court must view the " 'nature of the offender' " in concrete rather than in abstract terms: "[A]lthough the Legislature can define the offense in general terms, each offender is necessarily an individual." This branch of the inquiry "focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." Especially relevant in examining the nature of the offense and/or the offender is the degree of danger which both pose for society. (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.)

Finally, the court must be mindful of the sentences meted out other principals in defendant's crime to see that defendant's punishment is not exces-

---

[4]The court, in *Dillon,* rooted its discussion of proportionality primarily in the "techniques" identified in *In re Lynch* (1972) 8 Cal.3d 410, 425-429 [105 Cal.Rptr. 217, 503 P.2d 921], and its progeny.

sive relative to that of the other participants. In particular, the court in *Dillon* questioned a situation where one defendant might receive the heaviest penalty provided by law, while his jointly responsible accomplices received only the lightest. In this regard, the court in *Dillon* emphasized the need to bring the felony-murder rule into line with the notion of individual accountability and proportionate punishment. (*People* v. *Dillon, supra,* 34 Cal.3d at pp. 488-489.)

In this case, the trial judge reviewed *Dillon* and erroneously concluded that the trial court was not given "the option of engaging in perportionality [*sic*], comparing the culpability of one individual to another." The trial judge said that he thought the facts of the instant case fit those described in *Dillon* and that the defendant here was probably less involved than was the defendant in *Dillon* (whose offense was reduced from one of first degree murder to that of second degree murder). However, the judge did not believe that it was appropriate to fix the defendant's sentence at second degree murder given that "we do have the felony-murder rule." The trial judge believed that he did not have the discretion to reduce the crime charged, despite his belief that defendant never "intended the consequences or anticipated them or expected them," even if "she did help in placing [the] victim in a dangerous situation [from which] the consequences followed."

Had the trial court believed that it had the discretion to reduce the offense charged, the record clearly shows that "the court would [have] consider[ed] reducing it to a second degree [murder], . . . which would indicate a fifteen [years] to life sentence," instead of the twenty-five years to life prescribed for murder in the first degree. The trial judge stated that absent direction from *Dillon* or subsequent appellate decisions that the trial court could act on its own to implement the procedures detailed in *Dillon,* that any such balancing test must be carried out by the appellate courts, especially since the defendant would not be prejudiced by the delay.[5]

We disagree with the trial court's conclusion. Although appellate courts may review the proportionality of a sentence in felony-murder cases, we find nothing in *Dillon* which precludes the trial court from performing such a function. We believe the trial judge is uniquely suited to do the kind of balancing of factors enunciated in *Dillon*. It is the trial judge who observes the witnesses, determines their credibility, and weighs the evidence. Thus, he has a first-hand opportunity to analyze the panoply of factors that must be considered in determining the offender's "state of mind," "personal characteristics," and the degree of danger the offender poses to society.

---

[5]The trial court stated, "I am sure we will get an answer before [defendant] has been prejudiced as to any time that she is going to be spending."

In summary, while it is true that appellate courts have applied *Dillon* in adjudging the proportionality of sentences in a number of felony-murder cases without any discussions of the authority of trial courts to engage in a similar process, there is no reason in logic or law to deny to trial courts the discretion to determine proportionality under *Dillon* in *appropriate* felony-murder cases.

 We find that sufficient evidence exists to affirm the underlying convictions, but we remand this matter to the trial court for sentencing reconsideration in accordance with the opinions herein expressed.[6]

Ashby, J., and Hastings, J., concurred.

---

[6]Upon remand, we make no judgment as to whether defendant's offense should be reduced from one of first degree to second degree murder, but we find that the trial court has both the power and responsibility to make that sentencing choice, if it so elects, after weighing all of the factors set forth in *Dillon*.