[No. G002345. Fourth Dist., Div. Three. June 17, 1986.]

In re DOROTHY B., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
DOROTHY B., Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976(b) parts II, III, and IV are not published, as they do not meet the standards for publication.

**COUNSEL**

Howard C. Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and John W. Carney, Deputy Attorney General, for Plaintiff and Respondent.

---

## OPINION

SONENSHINE, J.—Dorothy B. was accused of the first degree murder of her infant son in a petition filed pursuant to Welfare and Institutions Code section 602.[2] The petition was sustained, and she was committed to the California Youth Authority. She argues: (1) There was insufficient independent evidence of a criminal agency to prove a corpus delicti and her incriminating extrajudicial statements were consequently inadmissible. (2) No corpus delicti of a first degree murder was independently proved, which also precluded introduction of her incriminating extrajudicial statements. (3) There was insufficient evidence of premeditation and deliberation. (4) The juvenile court failed to properly fix the degree of the murder and this court must amend the judgment to reflect a finding of murder in the second degree. And (5) the degree should be reduced from first to second in any event. We affirm.

### I

When Dorothy B., an unmarried high school student, became pregnant, she wanted an abortion. She met opposition, however. Her mother told her abortion amounted to murder and pressured her not to go through with it. Her boyfriend Paul, the expectant father, also opposed an abortion. Her stepfather told her abortion was immoral and convinced her to give up the idea.

Dorothy then considered adoption, and consulted an adoption agency. However, her mother and Paul opposed that option as well.

Dorothy was depressed during the pregnancy. The baby was large, and a cesarean section was necessary. She suffered complications, and her depression continued after the birth. The child, James M., became sick and required surgery when he was approximately two months old.

Having seen the difficulties experienced by her own mother, Dorothy was very concerned about her ability to raise her son. She had no money and few material possessions. Moreover, she was physically and emotionally

---

[2]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

devastated. After the birth, she worked in a restaurant about 40 hours a week. Paul was also helping to support the baby, but he was injured in a motorcycle accident and became unable to work when the infant was three months old.

Dorothy told her friend Misty she had decided to put James up for adoption and again talked to Paul about it. At first he agreed, but then changed his mind. Her stepfather also discouraged adoption. Dorothy's mother indicated she would adopt the baby herself and abandon Dorothy forever.

Dorothy longed to return to the life of a "normal" 16-year-old. She did not want to be a parent and asked Paul what he would do if there were just the two of them. She resented the baby and regretted her loss of freedom. Apparently she attempted to regain a measure of freedom: Paul caught her in bed with another male after the baby was born.

Dorothy confided her feelings to Lisa, a fellow student in the School-Aged Mothers program. She also had two or three discussions with Lisa about ways to kill an infant. She said she would either smother him to simulate crib death or perhaps allow James to be adopted. Crib death had been discussed in their program, and another friend in the program had lost a child in that manner. Dorothy quizzed her as to how the coroner determined the cause was crib death. The friend said, in effect, nothing else could be found wrong with the baby.

Dorothy told Lisa she could suffocate James and the authorities would never be the wiser. She asked Lisa not to reveal their conversation. Lisa got the impression she was not joking.

Dorothy finally murdered James when he was four months old. One afternoon, Paul and Misty picked up Dorothy at work between 1:30 and 2:30. It had been a bad day, and she was tired. She wanted marijuana, but they were unable to get any. Paul and Misty took Dorothy home at approximately 3 p.m. Her younger sister, Dana, was babysitting, and James was napping on his grandmother's waterbed. He awoke about 3:30; Dorothy, Dana, and their mother all played with him. Dorothy was left alone with the baby between 3:45 and 4 p.m.

When Dorothy's mother and stepfather returned at approximately 5 p.m., she asked her stepfather to "move [the baby's] head from the pillow." The child, face down on the pillow, appeared to be sleeping. But the stepfather noticed his lips were purplish and puckered, he had no pulse, and he was not breathing. Attempts were made to revive him and the paramedics were

summoned. They, too, attempted to resuscitate James but were unsuccessful. The baby was transported to the hospital and was pronounced dead.

Dorothy called Paul at about the time the death was discovered. He and Misty went to Dorothy's house, where she said, "James might be dead, I think he suffocated himself." Dorothy, Paul, and Misty went to the hospital, but returned to Dorothy's home after two hours or so. Paul and Dorothy went into her room, and she confessed to suffocating the baby with a pillow. She held the pillow to his face and watched as he struggled for his life. Once she lifted the pillow to let him catch his breath, but she put it back against his face and held it there until she believed he was dead.

Dorothy also confessed to Misty the following day and said she was either going to jail for the rest of her life or going to hell. She also said Paul knew but had vowed to keep the murder a secret.

Later the same day Misty returned to Dorothy's house with Dorothy's paycheck. The pastor for James' funeral service was there. Misty implored Dorothy to reveal what she had done. Dorothy asked to talk to the pastor. Later, in the pastor's presence, Dorothy told her mother she suffocated James with a pillow. Her mother said, "No, you didn't"; but Dorothy replied, "I did, and I want to die." Dorothy's mother took her to the police.

At the jurisdictional hearing, a forensic pathologist who had performed hundreds of autopsies on infants under the age of one testified, "I have never seen a baby suffocate by itself on a pillow. I don't think it's possible." However, he indicated death by suffocation or smothering can be difficult to detect and may leave no signs at all. There are certain characteristic internal signs which existed in this case, however.

Smothering may be accompanied by imprints of the teeth or gums on the lips. This pathologist had supervised the first autopsy of James, and after embalming he conducted a second one. Embalming frequently reveals bruising and hemorrhages not previously visible, and during the second autopsy a bruise was discovered on James' inner lip. This finding, along with other internal conditions, was consistent with a person placing James' head in a pillow and holding it there until he suffocated.

In the physician's opinion, sudden infant death syndrome was probably not the cause of death. Nevertheless, he could not pinpoint the cause, nor could he say with certainty whether the death was by natural causes or at the hands of another.

## II-IV*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## V

At the close of the jurisdictional hearing, the juvenile court sustained the petition. It concluded the murder was premeditated and deliberate but failed to expressly state the murder was of the first degree. Over two months later the juvenile court attempted nunc pro tunc to correct its jurisdictional order. The prosecution concedes the attempted correction was ineffectual, and we do not address it further. However, at Dorothy's disposition hearing the juvenile court again fixed the murder at first degree, and this procedure is permitted by rule 1355(f)(5) of the California Rules of Court.[4]

, Dorothy argues rule 1355(f)(5) is invalid. If true, we would be obligated to declare the murder supporting the jurisdictional finding to be second degree murder. However, we conclude rule 1355(f)(5) is valid and was properly employed here: "Rules of Court have the force of positive law; they are as binding on this court as procedural statutes unless they transcend legislative enactments or constitutional guarantees. [Citations.]" (*Oats* v. *Oats* (1983) 148 Cal.App.3d 416, 420 [196 Cal.Rptr. 20].) Moreover, we also conclude the rule can be used in proper cases to exercise leniency. This case, however, did not *compel* an exercise of leniency in the disposition.

 First, Dorothy argues section 702 "transcends" rule 1355(f)(5), by directing the juvenile court to "make and enter its findings and order, . . . and . . . then proceed to hear evidence on the question of the proper disposition to be made of the minor." (See also *In re Gladys R.* (1970) 1 Cal.3d 855, 859 [83 Cal.Rptr. 671, 464 P.2d 127].) We disagree; the statute and rule of court are not incompatible.

The declaration of the degree of murder was relevant to Dorothy's disposition, as we discuss, *post*. Here the crucial adjudicatory *finding* was

---

*See footnote, page 509, *ante*.

[4]Rule 1355(f)(5) provides, "(f) If, after hearing the evidence, the court determines that the allegations of the petition are true, it shall make findings as to each of the following, noted in the minutes of the court:

". . . . . . . . . . . . . . .

"(5) If the minor is found to be a person described by section 602, the degree of the offense and whether the offense would be a misdemeanor or felony had the offense been committed by an adult. These determinations may be deferred until the disposition hearing."

made at the initial hearing: Dorothy was a person described in section 602 because she committed murder. *Gladys R*. discusses the need for a bifurcated procedure (jurisdiction followed by disposition) in light of section 702, but does not purport to dictate the precise content of each hearing.

*In re Kenneth H*. (1983) 33 Cal.3d 616 [189 Cal.Rptr. 867, 659 P.2d 1156] is pertinent. In remanding so the juvenile court could declare a burglary to be a felony or a misdemeanor (§ 702), our Supreme Court noted, "the crucial fact is that the court did not state *at any of the hearings* that it found the burglary to be a felony." (*Id.*, at p. 620, fn. omitted, italics added.) While cases are not authority for propositions not considered (*People* v. *Burnick* (1975) 14 Cal.3d 306, 317 [121 Cal.Rptr. 488, 535 P.2d 352]), this passage hardly suggests hostility to the power embodied in rule 1355(f)(5). (See *In re Curt W*. (1982) 131 Cal.App.3d 169 [182 Cal.Rptr. 266]; see also *In re Robert V*. (1982) 132 Cal.App.3d 815 [183 Cal.Rptr. 698].) We decline to invalidate rule 1355(f)(5) on a strained argument concerning the legislative intent underlying the syntax of section 702.

Second, Dorothy argues rule 1355(f)(5) denies equal protection because the degree of an offense for an adult could not be fixed at sentencing. Again, we disagree. With respect to adult criminals, it is true a belated attempt to "correct" ex parte a failure to determine the degree of an offense is ineffectual. (See Pen. Code, § 1157;[5] see also *In re Candelario* (1970) 3 Cal.3d 702, 706 [91 Cal.Rptr. 497, 477 P.2d 729]; *People* v. *Williams* (1984) 157 Cal.App.3d 145, 154 [203 Cal.Rptr. 562]; *People* v. *Thomas* (1978) 84 Cal.App.3d 281, 284 [148 Cal.Rptr. 532].) A jury may not belatedly amend, clarify or correct its verdict. (See *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011]; cf. *People* v. *Najera* (1972) 8 Cal.3d 504, 512 [105 Cal.Rptr. 345, 503 P.2d 1353].) Equal protection would appear to extend the same restrictions to an *adult* court trial. (Cf. *People* v. *Anderson* (1975) 50 Cal.App.3d 325 [126 Cal.Rptr. 68].)

In compliance with rule 1355(f)(5), embodying a portion of Penal Code section 1157, a juvenile court must *at some time* make a finding as to the degree of a crime divided into degrees; the failure to do so renders the offense to be of the lesser degree by operation of law. (*In re Kenneth H., supra*, 33 Cal.3d 616, 619; *In re Eric J*. (1979) 25 Cal.3d 522, 529

---

[5]Penal Code section 1157 provides, "Whenever a defendant is convicted of a crime or attempt to commit a crime which is distinguished into degrees, the jury, or the court if a jury trial is waived, must find the degree of the crime or attempted crime of which he is guilty. Upon the failure of the jury or the court to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree."

[159 Cal.Rptr. 317, 601 P.2d 549].) In this respect juveniles and adults are treated alike.

However, it does not follow rule 1355(f)(5) denies a juvenile equal protection vis-à-vis adult *criminals* because it permits the degree to be fixed at the disposition hearing. (See generally, *People* v. *Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375].) ■ "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner. [Citation.] ■ Adults convicted in the criminal courts and sentenced to prison and youths adjudged wards of the juvenile courts and committed to the Youth Authority are not 'similarly situated.'" (*In re Eric J., supra,* 25 Cal.3d 522, 530, fn. omitted.)

In essence, Dorothy is arguing juveniles must be afforded *all* the procedural advantages given adult criminals because juvenile proceedings have an undeniably punitive effect. To a limited extent, we agree; it has been long recognized juvenile proceedings have punitive consequences. However, it has also been long recognized a juvenile *disposition* remains fundamentally distinct from a criminal *sentence.* Consequently, Dorothy's equal protection claim fails.

Some cases suggest punishment has *no place* in the juvenile justice system. (See, e.g., *In re Aline D.* (1975) 14 Cal.3d 557, 567 [121 Cal.Rptr. 816, 536 P.2d 65]; *In re Darryl T.* (1978) 81 Cal.App.3d 874, 881-882 [146 Cal.Rptr. 771]; *In re Dennis J.* (1977) 72 Cal.App.3d 755 [140 Cal.Rptr. 463].) But interestingly, in 1984, section 202 (formerly § 502), defining the purposes of the juvenile court law, was amended to recognize punishment has a place in the system *as a rehabilitative measure.* The statute specifically provides, in pertinent part, "'Punishment,' for the purposes of this chapter, does not include retribution." (Contrast, Pen. Code, § 1170, subd. (a)(1).)

The amendment realistically appraises the practical effect of juvenile proceedings. It was recognized *long* before section 202 was amended in 1984 that juvenile proceedings had punitive aspects even if punishment was not an objective of the system. (See *In re Demetrius H.* (1981) 118 Cal.App.3d 805, 808-809 [173 Cal.Rptr. 627]; *In re Mikkelsen* (1964) 226 Cal.App.2d 467, 471 [38 Cal.Rptr. 106]; *In re Contreras* (1952) 109 Cal.App.2d 787, 789-790 [241 P.2d 631].)

Despite this long-standing recognition, our Supreme Court has consistently recognized there is a fundamental distinction between the *consequences* of an adult criminal conviction versus a sustained juvenile petition. (See *In re Eric J., supra,* 25 Cal.3d 522, 530-531.) "[A]lthough we have

recently witnessed increased formalization of certain procedural aspects of the juvenile system [citations], and although the character of our adult penal structure may be evolving in any of a variety of directions, the fact remains that the juvenile system is fundamentally different from the adult penal system. Non-adversary in substance, the juvenile system is designed to place the state in the status of *in loco parentis*. Its underlying philosophy is that the state assumes a protective role with respect to the juveniles over whom it gains jurisdiction." (*Leroy T.* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 439 [115 Cal.Rptr. 761, 525 P.2d 665].)

And, as our Supreme Court has further explained, "The process of the juvenile court involves determination of the needs of the child and society, provision for guidance and treatment for the juvenile, and protection of the child from punishment and stigma. [¶] In recent years the courts, while preserving the beneficial aspects of the juvenile process, have held that certain procedural protections must be observed in order to guarantee the fundamental fairness of juvenile proceedings. [Citations.] *Gault, Winship* and the other decisions which insure such procedural fairness in juvenile proceedings do not, however, suggest a surrender of the salutary protections of the juvenile court system. As we observed in *In re Dennis M.* [1969] 70 Cal.2d 444, 456 [75 Cal.Rptr. 1, 450 P.2d 296], 'even after *Gault*' juvenile court proceedings 'retain a *sui generis* character' and are 'conducted for the protection and benefit of the youth in question.'" (*T.N.G.* v. *Superior Court* (1971) 4 Cal.3d 767, 775 [94 Cal.Rptr. 813, 484 P.2d 981].)

■ Consequently, any number of criminal law statutory procedures do not apply to juvenile proceedings: (1) the testimony of an accomplice (Pen. Code, § 1111) need not be corroborated in a juvenile proceeding (*In re Mitchell P.* (1978) 22 Cal.3d 946 [151 Cal.Rptr. 330, 587 P.2d 1144]); (2) a juvenile may not move for a judgment of acquittal (Pen. Code, § 1118) (*In re Joseph H.* (1979) 98 Cal.App.3d 627 [159 Cal.Rptr. 681], but see now § 701.1); (3) a juvenile may not have his or her arrest record sealed in the same manner as an adult (Pen. Code, § 851.7) (*T.N.G.* v. *Superior Court, supra,* 4 Cal.3d 767); (4) the appeal provisions of Penal Code section 1538.5, subdivision (m) do not apply to minors (*In re David G.* (1979) 93 Cal.App.3d 247 [155 Cal.Rptr. 500], but see now § 800 and *In re Joseph B.* (1983) 34 Cal.3d 952, 957-958 [196 Cal.Rptr. 348, 671 P.2d 852]); and (5) the penal provision for dismissal upon termination of probation is not available (Pen. Code, § 1203.4) (*In re S.A.* (1970) 6 Cal.App.3d 241 [85 Cal.Rptr. 775]).

"Not all rules of criminal procedure are applicable to juvenile courts. [Citations.] '[W]hen due process and other constitutional demands have been satisfied, reasonable differences in criminal and juvenile evidentiary

procedures are constitutionally permissible.' [Citation.] Equal protection does not forbid differences in the formalities with which a court goes about determining whether an individual has committed criminal misconduct; courts must 'look to the consequences of the proceeding rather than the formal labels to determine what rights are appropriately applied to juvenile proceedings.' [Citation.]" (*In re Joseph H., supra,* 98 Cal.App.3d 627, 631; see also *In re Michael V.* (1974) 10 Cal.3d 676, 684 [111 Cal.Rptr. 681, 517 P.2d 1145]; *Richard M.* v. *Superior Court* (1971) 4 Cal.3d 370, 377 [93 Cal.Rptr. 752, 482 P.2d 664].)

 A portion of Penal Code section 1157 *has* been adopted—the juvenile court must *at some time* determine the degree of the offense, to circumscribe the juvenile's period of confinement. (*In re Kenneth H., supra,* 33 Cal.3d 616, 619.) The practical impact of this rule is apparent. However, it does not follow that *all* statutory procedures designed for the sentencing of adults *must be* grafted onto juvenile court law.

The juvenile court judgment, including the degree of the offense, *remains* fundamentally different from a criminal conviction: "An order adjudging a minor to be a ward of the juvenile court shall not be deemed a conviction of a crime for any purpose, nor shall a proceeding in the juvenile court be deemed a criminal proceeding." (§ 203; *In re Joseph B., supra,* 34 Cal.3d 952, 955; *In re Anthony R.* (1984) 154 Cal.App.3d 772, 778 [201 Cal.Rptr. 299]; *In re James A.* (1980) 101 Cal.App.3d 332, 337-338 [161 Cal.Rptr. 588]; see also *In re Michael S.* (1983) 141 Cal.App.3d 814 [190 Cal.Rptr. 585].) So, even if we assume equal protection has some application, "disparities among classes are constitutionally permissible when reasonably related to proper purpose." (*In re Mitchell P., supra,* 22 Cal.3d 946, 950, fn. omitted.)[6] Rule 1355(f)(5) does not deny equal protection of the law on the ground it permits a juvenile court to fix the degree of an offense at the disposition hearing.

## VI

 To the contrary, we believe the rule was designed to have a salutary effect for the juvenile. Rule 1355(f)(5) permits a juvenile court to wait until it has received dispositional information about the juvenile to determine, when necessary, the degree of the offense or whether it would be a felony or a misdemeanor. Taking all the information into account, the court can then exercise *leniency* by declaring an offense to be of the lesser degree despite the fact the circumstances of the offense *alone* might justify sus-

---

[6]The interest at stake here does not call for application of a "strict scrutiny" test. (*In re Mitchell P., supra,* 22 Cal.3d 946, 950, fn. 3.)

taining the petition for a higher degree. In that way, the court, in most cases, can circumscribe the maximum period of confinement. This exercise of discretion, if deemed appropriate, is consistent with the vast array of dispositional alternatives the juvenile court already possesses by statute. (See *Leroy T.* v. *Workmen's Comp. Appeals Bd., supra,* 12 Cal.3d 434, 440; see also *In re Curt W., supra,* 131 Cal.App.3d 169, 184.)[7]

We emphasize this rule of court can only be used to limit the maximum period of confinement by declaring the crime to be of a lesser degree than the facts alone might show. *Gault* and its progeny prohibit a juvenile court from declaring an offense to be a *higher* degree than the facts show merely because the juvenile has a poor record.

 Now, turning to the present case, we must determine whether the juvenile court erred when it failed to declare the offense to be a second degree murder. Taking into account circumstances in Dorothy's background, we cannot say the juvenile court was compelled as a matter of law to declare her offense a second degree murder at the disposition hearing.

First, we are simply unable to determine whether such a declaration would have any practical impact on Dorothy's confinement in the Youth Authority. A minor may not be committed to the Youth Authority for a time in excess of the *maximum* period of time an adult could be incarcerated for the offense forming the basis of the section 602 petition. (§ 731; see *In re Robert D.* (1979) 95 Cal.App.3d 767 [157 Cal.Rptr. 339].) But the maximum period of confinement for an adult convicted of first *or* second degree murder is life imprisonment. (Pen. Code, § 190.) And it has been said that "the 'most important' purpose to be served by the required declaration [of the degree] is the determination of the maximum theoretical period of the minor ward's potential confinement. [Citation.]" (*In re Michael S., supra,* 141 Cal.App.3d 814, 818; see also *In re Kenneth H., supra,* 33 Cal.3d 616, 619, fn. 3.) Also it is true that the "Juvenile Court Law continues to provide for indeterminate terms, with provision for parole as soon as appropriate. (Welf. & Inst. Code, § 1176.)" (*In re Eric J., supra,* 25 Cal.3d 522, 532.)[8]

It is *possible* the degree of the murder would have an effect, even if subliminal, on the Youth Authority's determination of Dorothy's parole

---

[7]Arguably, there may be a distinction between a felony or misdemeanor declaration and a degree-fixing declaration. The latter will necessarily involve the facts of the offense, while the former often will not. Nevertheless, we conclude the flexibility of reserving determination discussed in *Curt W.* is just as applicable in the present context.

[8]We also note it has been said "'a determination whether or not the person committed the particular misdeed charged . . . may not in fact be critical to the proper disposition of many juvenile cases. . . .' [Citation.]" (*In re W. R. W.* (1971) 17 Cal.App.3d 1029, 1036, fn. omitted [95 Cal.Rptr. 354].)

suitability. But the impact is completely speculative; we cannot say the juvenile court was compelled to exercise its discretion in a particular manner on this basis.

Second, the circumstances of the offense itself do not compel an exercise of leniency pursuant to rule 1355(f)(5) either. We have previously concluded the evidence is sufficient to sustain a finding Dorothy committed a deliberate and premeditated murder. It may be unfortunate those around Dorothy discouraged abortion or adoption. Yet, Dorothy's *choice* shows she placed her personal freedom and desire to avoid responsibilities of parenthood ahead of her child's life. And we emphasize "choice," because the facts also show murder was an option considered over a substantial period of time. In addition, the manner of killing permitted time to reconsider or abandon the endeavor, but Dorothy apparently did neither. Dorothy's loved ones are not to be commended, but neither can they be used as scapegoats. At disposition, the trial court observed as much. As we previously concluded, the trial court properly found this was a first degree murder.

Third, other information before the juvenile court supports its finding. At the disposition, the court referred to Dorothy's "criminal sophistication." Her background, while troubled, also reveals a relative maturity belying Dorothy's contention she was overwhelmed by pregnancy and motherhood.

At least one source of this information was a police detective who knew Dorothy well when she was 12 to 13 years of age. He had as much contact with her as with any minor while he was assigned to the juvenile division. Dorothy was very mature for her age, uncooperative and used other people or circumstances as an excuse for her own behavior. Dorothy had a habit of leaving school early, drinking to intoxication, engaging in sexual activity with boys much older than she and telling her mother she was late getting home because she had been "raped."

Beyond that, other information showed Dorothy developed a problem of substance abuse, truancy and poor behavior. She was unresponsive to counseling because she "didn't like anybody telling her what to do." A school principal noted Dorothy resisted the discipline system at her junior high school. He also noted she was sophisticated, manipulative and sexually experienced. She was also unwilling to acknowledge her problems at school: "She basically did the things she wanted to do when she wanted to do them." But he also believed Dorothy was intelligent. By her own admission, Dorothy became adept at procuring illicit drugs for her own use.

To be sure, there are some sympathetic factors in her background. There apparently was abuse by her father and her psychological problems resulted

in suicide attempts. But again, there was credible information revealing a level of sophistication belying any claim Dorothy could not be held fully responsible for her acts. Put another way, we cannot say on this record she was overwhelmed by parenthood to a degree excusing her from the consequences of her behavior.

The decision before the juvenile court was *akin* to the decision faced by an adult court when it is argued imposition of a particular sentence is cruel and unusual punishment. As previously discussed, there is the question of the actual impact on the length of Dorothy's confinement in the Youth Authority. And we also note the following: while juveniles are not punished as such, it may still be true the declaration of a higher degree for an offense is too harsh and may carry a consequence now, if only in the mind of the minor, or in the future at the pleasure of the Legislature, or, witness Proposition 8, the electorate.

In an adult adjudication, Dorothy would be entitled to an application of the cruel and unusual punishment analysis employed by our Supreme Court in *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] and possibly a reduction of the offense to second degree murder. ■ Drawing out the admittedly imperfect analogy to adult sentencing, the question becomes whether the finding was "grossly disproportionate to the offense as defined or committed, and/or to the individual culpability of the offender. [Citation.]" (*People* v. *Leigh* (1985) 168 Cal.App.3d 217, 222 [214 Cal.Rptr. 61].) The test takes into account the nature of the offense, in concrete and abstract terms, and the nature of the offender, viewed in concrete terms. (*People* v. *Leigh, supra,* at p. 222.) The nature of the offense includes "such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his [or her] acts." (*People* v. *Dillon, supra,* at p. 479.) The nature of the offender focuses on "the defendant's individual culpability as shown by such factors as his [or her] age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

■ We need not finally determine whether a juvenile is entitled to the application of a *Dillon* analysis on equal protection grounds.[9] Assuming she is, Dorothy is not entitled to a more favorable result than that reached by the juvenile court. We have already discussed the nature of the offense, in concrete and abstract terms. Taking into account all the circumstances, we are not persuaded the offense compelled an exercise of leniency by the juvenile court. Similarly, the nature of this offender, Dorothy, does not

---

[9]Were it a necessity, a particularly interesting aspect of this case would require examination: Dorothy could have been, but was not, tried as an adult. (See § 707.)

persuade us a reduction of the offense is in order. The words frequently repeated to describe her were mature, sophisticated and intelligent. In other words, she was capable of grasping the gravity of her actions. Another oft-repeated comment was she desired to avoid responsibility. This is not only consistent with the offense itself, but her desire to make the death appear accidental. Dorothy does not present a compelling figure for leniency.

The judgment is affirmed.

Trotter, P. J., and Crosby, J., concurred.

A petition for a rehearing was denied July 2, 1986, and appellant's petition for review by the Supreme Court was denied October 2, 1986. Bird, C. J., Mosk, J., and Grodin, J., were of the opinion that the petition should be granted.