Filed 6/9/22  P. v. Nash CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076768 |
| v. | (Super.Ct.No. RIF2002177) |
| LAWRENCE ANTHONY NASH, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Charles J. Koosed, Judge.

Affirmed in part; reversed in part and remanded for resentencing.

Michael Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, A. Natasha Cortina, Acting Assistant Attorney General, Steve Oetting and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Lawrence Anthony Nash was with a group of friends when they confronted the victim, who was visiting his uncle's house next door. One of defendant's cohorts, Anthony Barrow, sucker punched the victim in the face. Barrow pushed the victim into a nearby SUV, shattering the window. Defendant jumped over the fence between the two properties and rushed at the victim with a sharp object that the victim and his mother identified as a knife. Defendant told the victim that he was going to kill him, and then stabbed the victim in the head causing a puncture wound.

Defendant claims in his opening brief on appeal that (1) insufficient evidence was presented to support his conviction of assault with a deadly weapon other than a firearm as there was no substantial evidence that he had a knife; (2) his criminal threat conviction must be reversed because there was no substantial evidence the alleged threat caused the victim to fear for his safety; (3) counsel was ineffective for failing to introduce the victim's testimony from the preliminary hearing to impeach the victim's trial testimony; and (4) the trial court erred by imposing consecutive sentences for both his assault and criminal threat convictions as they must be stayed pursuant to section 654. In a supplemental brief, defendant contends that Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3 [SB 567], eff. Jan. 1, 2022) restricts the trial court's discretion to impose an upper term sentence, requiring the matter be remanded for resentencing. We agree that remand is necessary for resentencing but otherwise affirm.

**FACTUAL AND PROCEDURAL HISTORY**

A. <u>PROCEDURAL HISTORY</u>

Defendant was convicted at a court trial[1] of one count of assault with a deadly weapon other than a firearm, a knife (Pen. Code, § 245, (a)(1); count 1)[2]; and one count of making criminal threats (§ 422; count 2). Defendant admitted he had suffered one prior serious and violent felony prior conviction within the meaning of sections 667, subdivisions (a)(1), (c) through (e)(1), and 1170.12, subdivision (c)(1). Defendant was sentenced to a state prison term of nine years four months, which consisted of the upper term of four years, doubled for the strike, for a total term of eight years on count 1, and a consecutive sentence of one year four months on count 2.

B. <u>FACTUAL HISTORY</u>

1. *PEOPLE'S CASE-IN-CHIEF*

On December 29, 2019, at around 4:00 or 5:00 p.m., the victim's mother was at her brother's house located on 29th Street in Jurupa Valley. Also home were her husband, her brother, her sister-in-law (hereafter, aunt), and some children. The victim was her son and he had just arrived at the house with his girlfriend to visit.

The victim's mother heard something outside. She went outside and saw that the victim was surrounded by four or five Black men. They were loudly cussing at him and appeared to want to fight him. The victim's mother saw a heavyset man, identified as

---

[1] Defendant waived his right to a jury trial.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

Anthony Barrow, push the victim into a nearby SUV. Barrow pushed the victim's head into the windshield of the SUV. The victim's head went backward and shattered the glass. Aunt was able to separate the victim and Barrow.

The victim's mother observed a skinny man wearing a brown hoodie, who she identified in court as defendant, jump over the fence from the house next door and approach the victim. She saw defendant pull something out of his waistband, which she thought was a knife. She said the knife was at least eight inches long. Defendant went toward the victim's head stabbing him with the knife. The victim had a gash on his head as a result and was bleeding. Defendant only stabbed the victim one time. The victim was able to push defendant out the gate of the property.

The victim and his mother headed back to the house. Barrow threw a brick at her. The victim was able to deflect it so it did not hit her in the head. Barrow said that he did not give a "fuck" that she was female. Later in her testimony, the victim's mother stated that defendant had thrown the brick and Barrow had thrown a helmet.

The victim testified he went to his aunt's and uncle's house in Jurupa Valley that day. He and his girlfriend pulled up to the house. He saw a group of Black men outside the house next door. One of the men was Barrow, who the victim described as being six feet, two inches tall, and weighing 400 pounds. Barrow asked to speak with the victim. As the victim approached Barrow, Barrow punched him in the face. Barrow mentioned that the victim "had to pay [his] respects" but never explained what that meant.

The victim told his girlfriend to go inside. The victim briefly went inside and then went back outside to the car to get items out of the car he was concerned they would take.

4

Barrow approached him by the SUV. The victim noticed that a window had been broken on his girlfriend's car.

The victim saw defendant jump over the fence from next door and he had something shiny in his pants. Barrow pushed the victim into the SUV. He pushed with enough force to break the window. At that point, defendant pulled out his knife—which the victim described as having a fixed blade and was eight inches—and stabbed the victim in the head. The victim was certain defendant was holding the knife. Defendant swung with a lot of force. The victim felt the pain of the knife going into his head. Defendant swung the knife at him several more times but the victim was able to move out of the way. Defendant told the victim, while holding the knife, just prior to stabbing him, that he was going to kill him.

Aunt and the victim were able to get Barrow off the victim and the victim was able to push defendant out of the gate. Defendant grabbed a brick. He and the others threw bricks at the victim and his family.

The victim explained he and Barrow had previously been involved in an incident during which Barrow took what he thought were drugs from the victim but they turned out not to be drugs. The victim denied he sold drugs to Barrow.

The victim did not want medical attention after the incident. He never saw the knife after the incident. He did not require stitches. He went to the doctor the next night and was told he had a minor concussion.

Aunt called the police. The victim was near aunt when she made the call. Aunt told the dispatcher that the people next door broke the window to her car and "stabbed

5

my nephew." She was asked who stabbed her nephew. It was clear she was speaking to someone else and then said, "Uhh, a, a big, which one stabbed [the victim]? Which one? A little one. The one that jumped the fence?" A male was heard speaking in the background, and then she reported, "Yes, so he jumped our fence. He's, he's wearing all gray with black pants." The man who stabbed the victim was short and very skinny and they only knew him as "Ant." Aunt reported that the victim was bleeding. Aunt stated that they did not know the size of the knife; they only saw "something shiny."

Riverside County Sheriff's Deputy Cosper was on duty on December 29, 2019, at approximately 5:18 p.m. When he arrived at the scene, he found several adult females who were "chaotic" and the victim was bleeding. He took pictures of the victim's wounds. The victim also had injuries to his arm and abdomen. Cosper found bricks and a helmet on the ground. He was told that the bricks had been thrown at the victim.

The victim was able to identify Barrow as the person who pushed him into the SUV. The victim gave a description of defendant and said he was named Ant or Anthony. The victim did not know his last name. Deputy Cosper observed the broken windshield on the SUV.

Deputy Cosper spoke with the victim's mother. She told him that she was unsure how the victim was injured. Cosper did not recall her mentioning a knife. The victim told him that he saw a knife. He described it as being steel. The knife was not found. He described the victim's wound as being a puncture wound. The victim told him that he had been stabbed two times but Cosper only observed one puncture wound. The victim also told Cosper that defendant threatened him that he was going to die. Barrow threw a

6

brick at him; the victim did not state that defendant threw a brick at him. Cosper never asked the victim's mother if she had seen a knife.

The victim's mother explained that she was scared when she spoke with Deputy Cosper. She did not recall what she told him. She denied that the victim ever swung at Barrow. The victim's mother admitted that she never told Cosper that night that she saw a knife. She did not recall telling him that Barrow had thrown the brick.

The victim acknowledged that he did not want to testify. He was in custody when he was brought to court for the preliminary hearing. He was scared during the preliminary hearing because he had received threats that some people were going to try to beat him up in custody if he testified against defendant. He identified defendant at the hearing. He was scared at trial to testify because of his own pending case for which he might go back into custody. He had one interaction with defendant after the incident and it had been peaceful.

The victim did not recall telling Deputy Cosper he had been stabbed more than once. He denied ever taking a swing at Barrow or defendant. He had told Cosper that he saw defendant with a shiny object but was sure at trial that it was a knife. It looked like a fixed-blade kitchen knife. Defendant had the knife tucked in his waistband when he jumped the fence. The victim insisted he told Cosper that both Barrow and defendant were throwing bricks at them. Defendant ran up the street before Cosper arrived.

Riverside County Sheriff's Deputy Valenciano was assigned to the gang task force at the sheriff's department. She followed up on the incident because the Westside PJ gang had been mentioned during the investigation. Deputy Valenciano discovered that

7

defendant might look like the person who the victim described as stabbing him. The victim identified defendant on June 23, 2020.[3]

Deputy Valenciano then spoke with defendant on that day or the next day. Defendant admitted to her that he was a member of Westside PJ and that they called him Ant or Pharaoh. Defendant initially told her that on the day of the incident he believed he was in Palm Springs. Defendant had been arrested on June 24, 2020, for being under the influence. Valenciano admitted he may have been still intoxicated when she spoke with him the first time.

On June 30, 2020, Deputy Valenciano interviewed defendant a second time. He told her he was mistaken about being in Palm Springs and that he was present during the altercation with the victim. Defendant told her that Barrow punched the victim in the face and pushed him into the SUV. He denied that he was involved in the altercation. Defendant insisted that the victim was cut when the window broke not because he stabbed him.

2. *DEFENSE*

Hudson Bales was a private investigator and testified as an expert. Bales had been a deputy sheriff at the Riverside County Sheriff's Department for 17 years. He also had served in the Marine Corps. He was a close combat instructor for the Marine Corps and a use of force expert for the Riverside County Sheriff's Department. He had been trained

---

[3] The victim testified he was afraid to be seen talking with Deputy Valenciano because "snitches get stitches." He denied he ever told Valenciano that he had been stabbed in the head twice.

8

in the use of knives. He had seen persons injured by a bladed instrument on five prior occasions.

Bales suspected that if a person was stabbed in the head, there would be a graphic puncture wound. He also would expect it to be a lethal blow. It was possible to puncture the skull and cause fractures. He looked at photographs taken of the victim's injuries. His injuries were not consistent with being twice stabbed in the head. There were abrasions; not stab wounds. He would expect to see blood splatter on the SUV.

Bales concluded that the victim's injuries were not consistent with being stabbed in the head with a fixed blade. His injuries were consistent with being slammed against a car window that shattered. He admitted no glass had to be removed from the victim's head. Bales had not been involved in a prior case involving a single puncture wound from glass. He denied that even if the victim was moving, that such an injury came from a knife blade.

Defendant testified on his own behalf. He had a previous conviction for domestic violence. On December 29, 2019, defendant was at Barrow's house. He saw the victim next door and Barrow said he needed to talk to him. Barrow went next door to talk to the victim. Defendant jumped over the fence to get next door. Defendant wanted to talk to the victim because he heard he was selling marijuana laced with bath salts and a girl had been hospitalized. Defendant wanted to confront the victim. After he jumped the fence, he stood beside Barrow who was talking to the victim. The victim grabbed defendant and threw him.

Barrow confronted the victim as to why he had thrown defendant. The victim hit Barrow in the side of the head. Barrow responded by pushing him into a nearby SUV and the window broke. Barrow hit the victim. Defendant thought everything was over and started to run. He saw one of the victim's family members run up with a knife in his hand. The victim was already in the house and defendant stood outside in the street. The victim's family members called his group the "N" word and cussed at him. Defendant grabbed a golf club and hit one of their cars. He insisted he was in Barrow's yard when the police arrived; he did not leave. He never talked to the police because they never asked to speak with him.

When he first spoke with Deputy Valenciano she asked him if he was present at a stabbing. He did not know what she was talking about because he claimed no one was stabbed during the incident with the victim. He was in Palm Springs sometime around the time of the incident. Defendant denied he had a knife during the incident. He did not say anything to the victim that day; he never threatened to kill him or told him he was going to die. Defendant insisted it was only a fight between the victim and Barrow, and no one was stabbed.

## DISCUSSION

A.  <u>INSUFFICIENT EVIDENCE</u>

Defendant contends the evidence was insufficient to support his conviction of (1) assault with a deadly weapon not a firearm, and (2) making criminal threats.

10

1. *STANDARD OF REVIEW*

The California Supreme Court has stated that in assessing a sufficiency of the evidence claim, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) " "" 'Once such evidence is found, the substantial evidence test is satisfied. [Citation.] Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 711.) The testimony of "a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions." (*People v. Leigh* (1985) 168 Cal.App.3d 217, 221; see also *People v. Wetle* (2019) 43 Cal.App.5th 375, 388.)

2. *ASSAULT WITH A DEADLY WEAPON*

Defendant argues there was no substantial, credible evidence presented that he was in possession of a knife and stabbed the victim, to support that he committed assault with a deadly weapon.

"The crime of assault with a deadly weapon has two components: '(1) the assault, and (2) the means by which the assault is committed.' " (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 85 (*Raymundo*).) "For purposes of assault with a deadly weapon under section 245(a)(1), 'a "deadly weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great

11

bodily injury." [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury.' [Citation.] 'Because a knife can be, and usually is, used for innocent purposes, it is not among the few objects that are inherently deadly weapons.' [Citation.] 'In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.' " (*Id.,* at pp. 85-86.)

Here, aunt called 911 immediately following the incident. She told the 911 operator that the people next door had "stabbed my nephew." She also stated that the "little one" who had jumped the fence had stabbed the victim. She could not describe the size of the knife but only stated that it was shiny. At trial, the victim testified that defendant pulled a knife out of his waistband and swung at him. He felt the pain of the knife going into his head. The victim was certain at trial that defendant was holding a knife and described it as a fixed-blade knife with an eight-inch blade. The victim's mother testified at trial that she observed defendant jump over the fence between the two properties and pull a knife out of his waistband. She described the knife as being eight inches long. Defendant stabbed the victim in the head with the knife. The victim had a gash on his head as a result. The trial court was shown photographs of the injury.

In finding the evidence supported that defendant committed assault with a deadly weapon, the trial court did not think that the victim and his mother had a motive to lie.

12

He recognized that the victim's mother may be biased, but she clearly identified defendant as being present at the scene. Further, the victim and his mother corroborated each other on the details of the incident. The trial court believed that the victim and his mother saw a knife and had no motive to lie. It was consistent that defendant would threaten to kill the victim while holding a knife. The trial court also found that defendant was not credible based on him changing his story about the incident several times. Finally, the trial court did not believe that the victim would have received a wound on the back of his head from being slammed into the car window.

The evidence supports the trial court's conclusion that defendant had the knife and committed assault on the victim. The victim stated when Deputy Cosper arrived that defendant had a knife and had stabbed him. The victim had blood on his head and a puncture wound. Aunt also stated on the 911 call that the victim had been stabbed. Based on this testimony, the trial court could conclude that defendant had stabbed the victim and caused the injury to the victim's head, supporting defendant's conviction of assault with a deadly weapon.

Defendant relies on the inconsistencies in the testimony given by the victim and his mother. However, " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

13

Defendant refers to the 911 call and insists that the victim could not describe the knife to aunt on the day of the incident. However, the person speaking with aunt was never identified on the 911 call. Such speculation that it was the victim and he could not identify the knife is not supported by the record. Further, defendant complains about the victim's statement to Deputy Cosper that the victim could only identify the knife as shiny and steel. He also points to the victim being asked about the preliminary hearing testimony in which he only described the knife as being shiny.[4] Defendant contends that if the victim truly saw a knife, he would have been able to describe it. The victim was adamant at trial that he saw a knife and was able to describe it. The trial court reasonably could believe that the victim saw something in defendant's waistband, and that it was in fact a knife based on the puncture wound to the victim's head. We will not reassess the victim's credibility on appeal as it was the trial court's duty to assess his credibility. (*People v. Lee*, *supra*, 51 Cal.4th at p. 632.)

Further, defendant claims that, based on his expert Bales's testimony, the stabbing was a "physical impossibility." Bales testified he would have expected that a blow to the head with the knife described by the victim would be a lethal blow and that his injury was not consistent with a knife wound. At one point, however, Bales described the wound as a "small cut" and also as a "puncture wound." Bales also admitted that knives can cause puncture wounds and that no glass was removed from the victim's head; but that his prior

---

[4] Defendant refers to all of the testimony at defendant's preliminary hearing but it was not all admitted at trial. Only portions of the preliminary hearing testimony were discussed at trial.

14

experience with glass wounds resulted in "flayed open" wounds and not puncture wounds.

Bales never testified it was a "physical impossibility" that the victim was stabbed. Rather, he testified that he would have expected a different type of wound and that the blow would have been lethal. However, the trial court relied upon the photograph of the wound, witness testimony, and that the wound could not have been caused by the glass breaking. Such conclusion is supported by the evidence.

Based on the evidence before the trial court, it could reasonably conclude that defendant had stabbed the victim in the head to support his conviction of assault with a deadly weapon.

3. *CRIMINAL THREATS*

Defendant insists his criminal threats conviction in count 2 was not supported by substantial evidence as the threat did not cause the victim to be in sustained fear based on defendant's threats.

The elements of a criminal threat under section 422 are as follows: "The prosecution must prove '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electric communication device"—was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of

15

purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' " (*In re George T.* (2004) 33 Cal.4th 620, 630; *People v. Toledo* (2001) 26 Cal.4th 221, 227-228; see also § 422.)

"A threat is sufficiently specific where it threatens death or great bodily injury.  A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution, section 422 does not require those details to be expressed.' " (*People v. Butler* (2000) 85 Cal.App.4th 745, 752.)  "[I]t is the circumstances under which the threat is made that give meaning to the actual words used.  Even an ambiguous statement may be a basis for a violation of section 422." (*Id.* at pp. 753-754.)

" 'Sustained fear' refers to a state a mind." (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349 (*Fierro*).)  "[A] victim can experience sustained fear even if the fear exists only during the incident itself, as long as the fear during the incident is more than 'momentary, fleeting, or transitory.' " (*People v. Brugman* (2021) 62 Cal.App.5th 608, 634.)

In *Fierro*, the court concluded there was substantial evidence the victims felt "sustained fear" when a father and son got into an argument with defendant at a gas station and heard the defendant say, " 'I will kill you . . . right now,' " and lifted up his shirt to reveal a weapon.  Both victims were afraid that the defendant was going to shoot them. (*Fierro*, *supra*, 180 Cal.App.4th at pp. 1345-1346, 1349.)  The *Fierro* court found that even a single minute of fear, during which the victim heard the threat and saw the

weapon, qualified as "sustained" under the statute. (*Id.* at p. 1349.) "When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.'" (*Ibid*.)

Based on the statements made by defendant and the surrounding circumstances, there was sufficient evidence of a violation of section 422. Defendant pulled a knife from his waistband. The victim had just been pushed into the SUV by Barrow. At that point, defendant said he was going to kill the victim and the victim was going to die. The victim specifically testified that he was in fear when defendant made those statements. As in *Fierro*, the threat, along with seeing the knife in defendant's hand, was sufficient to support that the victim was in sustained fear of his life. Defendant then rushed toward the victim and stabbed him in the head. This was more than sufficient evidence to support that the victim's fear was more than momentary or fleeting.

Defendant claims that his words were not the cause of fear for the victim because at the time he said the words, Barrow had already pushed him into the SUV and defendant was supposedly coming at him with a knife. However, the testimony from the victim was clear that when defendant was holding the knife and told him that he was going to kill him, he was scared. Defendant tries to distinguish the victims' fears in *Fierro*, *supra*, 180 Cal.App.4th 1342 by claiming there was no direct testimony from the victim that he was afraid of defendant's words. However, we see no difference in this case from *Fierro*. The showing of the weapon in each case occurred simultaneously with the threat to kill. The victim specifically stated he was in fear when defendant had the knife in his hand and threatened to kill him.

17

Substantial evidence supports that the victim's fear of defendant when he held a knife to him and threatened to kill him was more than " 'momentary, fleeting, or transitory' " (*Fierro*, *supra*, 180 Cal.App.4th at p. 1349.)  The evidence supports defendant's conviction of making criminal threats.

B.     INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends his counsel should have presented the victim's inconsistent preliminary hearing testimony on the question of whether he lost consciousness and therefore did not see defendant stab him, and that he had previously testified that he could not recall if Barrow or defendant had the knife.  These inconsistent statements were admissible pursuant to Evidence Code section 1235.  The People insist the issue is better raised in a habeas corpus petition based on there being no explanation from counsel as to why the statements were not admitted, and the prior inconsistent statements are not readily available in the record.  We disagree with the People as to the unavailability of the prior testimony, as the preliminary hearing testimony is part of the record.  However, since there is no explanation from counsel for the reasons the statements were not admitted, we agree this claim is better raised in a habeas corpus petition.

1.     *ADDITIONAL FACTUAL HISTORY*

The prosecutor had to obtain an order compelling the victim's appearance at the preliminary hearing.  The victim testified about the events of December 29, 2019.  He identified defendant and said that defendant was a member of Westside PJ.  He stated that two of the men pushed him against a car.  He testified, "I get hit in the head.  I kind of black out a little bit.  When I come to, I got blood, like, coming all up from my head and

18

all over my face." He was asked further about being pushed into the car. The victim responded, "Like I said, I blacked out. You know what I mean? When I came to, I had blood all over me already." The victim was asked, "Do you remember telling Deputy Cosper that one of the men was holding a knife in their right hand?" He responded, "Yeah." The victim also stated that "I remember seeing the knife, but I mean, they were—it was, like, in the middle of both of them, and they were both coming at me, and I had no time to, like—you know what I mean?" The victim was asked if he remembered getting stabbed anywhere on his body, and he responded, "Like I said, it happened really fast, you know. And I'm sure, like, when it happened, that's what made me black out, close my eyes, or maybe adrenaline. Close my eyes. Whatever it was."

The victim later said he remembered being hit and that it felt like a "penetrative, contactive blow." He felt the knife penetrating his head. He lifted his hand to feel the wound. The victim also identified defendant as being the one who stabbed him with the knife. The victim stated he had threats on his life about testifying at the preliminary hearing. He was scared for his own safety. He clarified that he went unconscious or closed his eyes after he was stabbed in the head.

During the victim's trial testimony, the following exchange occurred:

"[Defense Attorney:] As you sit here today, you're telling me that you don't recall how many times you were stabbed in the head?

"[The Victim:] I know the first time I got stabbed in the head it was a surreal feeling, so I was trying to get out of there. I wasn't trying to get hurt any more.

19

"[Defense Attorney:]  And isn't it true that when you were at the preliminary hearing, you testified you said that, in fact, Mr. Barrow hit you so hard against the glass of that vehicle that you momentarily blacked out?  Do you remember saying that?"

"[The Victim:]  I remember saying something of the sort where I needed to—I needed to—I needed to sum up the answer.  I needed to explain what that was.  And that was a surreal moment.  It wasn't a blackout.  It wasn't a lose consciousness.  It was a moment of understanding that things were going—were real—getting real at the moment as far as I got stabbed in the head and my aunt was on top of me pushing this guy off of me.

"[Defense Attorney:]  Let me stop you there.  Now, when you testified at the preliminary hearing, you said you didn't remember who had the knife.  Do you remember saying that?

"[The Victim:]  I did not say I remember who had the knife.  I remember saying he had something shiny in his waistband and that whether or not he had pulled it out and used it."

The victim was later asked, "All right, but you said earlier though when you got hit, you sort of blacked out or you had a kind of out-of-body experience?"  The victim responded, "I didn't say black.  I said like surreal moment."  He was asked, "Surreal moment.  Where you kind of weren't registering what was going on.  Is that safe to say?"  The victim stated, "I was fully registering everything that was going on.  I was understanding that I had just got struck in the head with a knife."

2    *ANALYSIS*

"The standard for showing ineffective assistance of counsel is well settled. 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.' " (*People v. Gray* (2005) 37 Cal.4th 168, 206-207 (*Gray*); see also *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

"If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus." (*Gray*, *supra*, 37 Cal.4th at p. 207.)

The record does not illuminate the reasons why counsel chose not to introduce the preliminary hearing testimony at trial. Defendant does not argue that there was no satisfactory explanation for counsel's failure to seek the actual testimony from the preliminary hearing be admitted. In fact, defendant acknowledges that counsel did cross-

21

examine the victim by asking about his preliminary hearing testimony but complains that trial counsel did not seek to admit the victim's statements from the preliminary hearing. The record does not shed light on why counsel failed to seek to admit the exact statements the victim made at the preliminary hearing. While we may surmise that since the victim later clarified his statements at the preliminary hearing, counsel may have felt their admission was not helpful to defendant. However, we will not speculate, and as such, defendant has not met his burden of establishing ineffective assistance of counsel on appeal. The claim is better addressed in a habeas corpus petition. (*Gray*, *supra*, 37 Cal.4th at p. 207.)

C.      SECTION 654

Defendant insists his assault with a deadly weapon and criminal threats convictions in counts 1 and 2 occurred in a single transaction. The trial court erred by refusing to stay his 16-month sentence on count 2.

### 1.      *ADDITIONAL FACTUAL BACKGROUND*

Defendant submitted a sentencing memorandum. Defendant argued that section 654 applied to the convictions based on the charges arising out of the same act and they occurred contemporaneously. The court should stay the penalty for the criminal threats conviction.

At the sentencing hearing on March 15, 2021, the trial court considered the probation report and defendant's sentencing memorandum. The trial court asked the prosecutor to address whether count 2 should be stayed. The prosecutor argued that count 2 was a separate act. The trial court found, "As for the sentence itself, I disagree

22

with [defense counsel] as to staying Count 2. I don't think it qualifies under 654. I think, again, telling someone that you're going to kill them is not part and parcel of a 245 with a knife. That type of language certainly again increases the amount of harm and makes the situation even worse. To say those sorts of words can and did I know frighten the victim even more as he's being assaulted in his own home no less, his driveway, where he lives. It's supposed to be a place of safety. So there's no basis at least in my opinion that Count 2 should be stayed."

Defendant was then sentenced to the upper term of eight years on the assault with a deadly weapon conviction in count 1. The trial court then sentenced defendant to one year four months on the criminal threats conviction in count 2, and it was ordered to run consecutive to the charge in count 1.

2.     *ANALYSIS*

Section 654 provides, in relevant part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Former § 654, subd. (a).)[5] The statute "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes

---

[5] Section 654 had been modified since sentencing in this case, effective January 1, 2022, to read "An act or omission that is punishable in different ways by different provisions of law *may* be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (Stats. 2021, c 441 (A.B. 518), § 1, eff. Jan. 1, 2022, italics added.) The change does not impact the issue raised on appeal.

occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642.)

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.)

"The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.)

Defendant was holding the knife when he threatened the victim that he was going to kill him. We have already concluded that this caused the victim to be in fear of his life. Defendant then stabbed the victim. These two acts were separate. Moreover, the evidence supports that defendant harbored separate objectives.

In *Raymundo*, *supra*, 52 Cal.App.5th 78, the defendant and several other young men approached another young man on the street. The defendant was holding a knife and

chased after the young man. He yelled to the young man when he got close to him that he was " ' going to die today.' " (*Id.* at p. 83.) The trial court sentenced the defendant on the criminal threats in addition to the assault conviction. On appeal, the defendant argued that the trial court should have stayed the criminal threats sentence because it was duplicative of the assault conviction. (*Id.* at p. 83, 94.)

The appellate court held that the trial court "could reasonably have found that [the defendant] committed the assault with the objective of inflicting *physical* harm on [the victim], whereas [the defendant] criminally threatened [the victim] with the separate objective of inflicting *mental or emotional* harm." (*Raymundo M.*, *supra*, 52 Cal.App.5th at p. 95.) Citing to several other cases that held the same, the court observed, "[c]ourts routinely recognize similar distinctions." (*Ibid.*)

This case is similar to *Raymundo*. While holding the knife, defendant told the victim that the victim was going to die and that the defendant was going to kill him. He then stabbed the victim in the head. The trial court reasonably concluded the threat, "increase[d] the amount of harm" and "frighten[ed] the victim even more as he's being assaulted in his own home no less, his driveway, where he lives." The trial court's reasons are similar to the conclusion in *Raymundo*, that the threat had a separate objective of causing mental or emotional harm. The trial court properly imposed consecutive sentences on counts 1 and 2.

D.     SB 567

Defendant contends that SB 567's amendment to section 1170, subdivision (b), requires remand for resentencing in order for the trial court to reconsider his sentence

25

under the new law.  The People contend remand is unnecessary as any conceivable error

the trial court made in imposing the upper term was harmless beyond a reasonable doubt.

1. *ADDITIONAL FACTUAL HISTORY*

In his sentencing memorandum, defendant argued there were several mitigating

factors, including the factors relating to the crime.  He argued he was not the primary

aggressor and the injuries sustained by the victim were not severe.  Further, defendant

argued factors relating to defendant in mitigation included that he had an insignificant

criminal record for which he had never served more than two years in prison.  Further, a

lengthy prison sentence would not serve the ends of justice.

Defendant was sentenced on March 15, 2021.  The trial court had read the

probation report and letters submitted by defendant.  The probation report listed the

following aggravating factors:  (1) the crime involved great violence, great bodily harm

or other acts disclosing a high degree of cruelty, viciousness, or callousness; (2) he was

armed with a weapon at the time of the crime; (3) he had engaged in violent conduct that

indicated a serious danger to society; (4) his prior convictions as an adult were numerous

or of increasing seriousness; (5) he had served a prior prison or county jail term; (6) he

was on probation or parole at the time the crimes was committed; and (7) his prior

performance on probation or parole was unsatisfactory.  There were no factors in

mitigation.  The probation report also listed defendant's prior convictions beginning in

2006.  Defendant was convicted of the prior serious and violent felony conviction he

admitted in this case in 2017, and was released on parole on June 17, 2018.

26

Defendant's sister, his aunt and his mother all provided letters that stated he had a substance abuse problem and would benefit from treatment. They also asked the trial court to have mercy on defendant. Defendant's counsel was requesting a sentence of four years. The prosecution requested that the trial court impose the upper term on count 1, doubled for the strike, for a total of eight years; and that count 2, which should be one year four months, run consecutive to count 1. The prosecutor recommended that the sentence on the five-year prior conviction—found true pursuant to section 667, subdivision (a)(1)—be stayed. The trial court noted that the probation department had recommended a sentence of 14 years 4 months, which would require imposition of the sentence on the serious prior conviction.

The trial court told defendant, "I don't intend to max you out, sir. [¶] [Defendant], I don't doubt everything that people have said about you. I don't doubt that at all. I think all of those letters are sincere. I think your letter to me was sincere. I agree with all of those things. To some degree though, my hands are a little tied at this point. And I hope you recognize that." The trial court further stated, "Once I actually hear the facts of the case and we get—and there's a conviction, then we get this far, then, you know, then my hands become tied to some degree." Defendant was ineligible for probation because of his criminal record. Further, he had failed several times in rehabilitation programs. The trial court felt that stabbing "someone in the head with a knife is a serious and violent felony." Based on defendant's record, the trial court noted that it would not strike the prior.

The trial court again stated that it did not agree with the probation report that defendant should be maxed out on his sentence. The trial court praised defendant for having shown remorse and insight into his behavior. "I'm not looking to put you in prison for as long as possible. That is not my goal here." The trial court agreed the five-year prior should be stayed.

In imposing the upper term on count 1, the trial court noted, "Your record doesn't warrant low term. The mitigating circumstances are next to none other than you've shown semi-remorse, which I appreciated, which is getting your nickel prior stayed. Other than that—and not being the primary aggressor in the beginning, although what you end up doing is a lot more serious than what the other person did. I'll say that." It found the aggravating circumstances outweighed the mitigating circumstances.

In imposing sentence, the trial court relied on defendant's criminal record, which dated back to 2006. The trial court had reviewed his history in the probation report. Defendant had a prior serious or violent felony conviction, which he admitted and was recent. The trial court considered the current assault conviction to be a serious and violent felony conviction. The trial court concluded that the aggravating factors outweighed the mitigating factors and imposed the upper term on count 1.

### 2. *APPLICATION OF SB 567*

SB 567 amended section 1170, effective January 1, 2022. It allows the trial court to impose an upper term sentence under only certain circumstances. Effective January 1, 2022, section 1170, subdivision (b)(1) provides "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound

28

discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (Fn. omitted.) Subdivision (b)(2) provides, "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial. Except where evidence supporting an aggravating circumstance is admissible to prove or defend against the charged offense or enhancement at trial, or it is otherwise authorized by law, upon request of a defendant, trial on the circumstances in aggravation alleged in the indictment or information shall be bifurcated from the trial of charges and enhancements. The jury shall not be informed of the bifurcated allegations until there has been a conviction of a felony offense."

At the time of defendant's sentencing in March 2021, section 1170, subdivision (b), gave the trial court discretion in selecting a lower, middle, or upper term after considering the record, the probation officer's report, and other evidence. (Former § 1170, subd. (b) ["The court shall select the term which, in the court's discretion, best serves the interests of justice"].) However, under the newly amended law, the trial court may only impose an upper term sentence where the facts underlying all of the aggravating circumstances have been stipulated by the defendant or found true beyond a reasonable doubt by a jury or court trial. (§ 1170, subd. (b)(2).)

29

There is an exception to the requirement of the jury or court finding the aggravating circumstances true beyond a reasonable doubt. Under section 1170, subdivision (b)(3), the trial court, "may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).) However, section 1170, subdivision (b)(5), provides in pertinent part, "The court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (§ 1170, subd. (b)(5).)

Initially, the People agree that the provision applies retroactively. SB 567's amendments to section 1170, subdivision (b), lessens punishment, and there is no indication that the Legislature intended it to apply prospectively only. As such, the new law must be retroactively applied. (See *In re Estrada* (1965) 63 Cal.2d 740, 744-745; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

Here, the trial court did find that defendant committed the crime of assault with a deadly weapon with a knife. However, the trial court did not separately determine the truth of the aggravating factors beyond a reasonable doubt as required by the amendment to section 1170. The People contend that such failure to consider the truth of the aggravating factors was harmless beyond a reasonable doubt. The People insist that the certified records, if obtained, would support the trial court's reasons for imposing the upper term. We choose to remand for resentencing rather than address the People's argument for the reasons stated *post*.

30

Neither of the parties have addressed that the trial court stayed the sentence on the section 667, subdivision (a)(1), serious felony enhancement. Prior to January 1, 2019, trial courts were required to impose a properly pleaded and proven enhancement under section 667, subdivision (a)(1). (*People v. Jordan* (2006) 141 Cal.App.4th 309, 319.) However, the law was changed to provide trial courts with discretion to dismiss such enhancements, or to strike the punishment therefor, "in the furtherance of justice." (Former, § 1385, subd. (b).) The current version of section 1385, effective January 1, 2022, does not authorize the stay of a sentencing enhancement but allows the trial court to dismiss the punishment for the enhancement under section 1385, subdivision (b)(1). (Stats. 2021, c 721 (S.B. 81), § 1, eff. Jan. 1, 2022.) As such, since defendant's case is still pending on appeal, defendant's sentence is unauthorized. Additionally, it is not clear whether the trial court would choose to impose or strike the enhancement, or strike the punishment, even though it mentioned it did not want to max out defendant's sentence, as it also refused to strike the prior conviction.[6]

Based on the changes made by SB 567 to section 1170, and that the record does not shed light on whether the trial court would have struck or imposed the five-year prior if had known it could not stay the enhancement, remand to the trial court for resentencing is the appropriate remedy.

---

[6] We also note that there are several factors in section 1385 that prohibit imposition of an enhancement, which may be applicable to defendant's section 667, subdivision (a)(1) prior. (See § 1385, subdivision (c)(1).)

## DISPOSITION

Defendant's sentence is vacated and remand for resentencing is ordered in accordance with this opinion.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

32